**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**

**GARY THOMPSON**                                                                **PLAINTIFF**

**v.**                                   **Case No. 4:13-cv-735-KGB**

**ANDY SHOCK, individually
and in his official capacity
as Faulkner County Sheriff**                                                **DEFENDANT**

## OPINION AND ORDER

Before the Court is defendant Andy Shock's motion for summary judgment (Dkt. No. 16), to which plaintiff Gary Thompson has responded (Dkt. No. 23).  Mr. Thompson brings this action pursuant to 42 U.S.C. § 1983 and the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-101 *et seq*., alleging that defendant Sheriff Shock, in his official and individual capacities, violated Mr. Thompson's rights under the First Amendment to the United States Constitution, the Arkansas Constitution, and the Arkansas Public Employees Political Freedom Act.  Mr. Thompson also alleges that Sheriff Shock, in his official capacity, violated the federal Fair Labor Standards Act ("FLSA") and the Arkansas Minimum Wage Act ("AMWA").  Sheriff Shock asserts the defense of qualified immunity and moves for summary judgment on Mr. Thompson's claims.  Sheriff Shock also moves for summary judgment on Mr. Thompson's claims for damages.

For the following reasons, the Court grants in part and denies in part Sheriff Shock's motion for summary judgment (Dkt. No. 16).  The Court grants Sheriff Shock's motion for summary judgment on Mr. Thompson's claims under the First Amendment against Sheriff Shock in his official and individual capacities.  The Court also grants Sheriff Shock's motion for summary judgment as to Mr. Thompson's claims under the FLSA and AMWA against Sheriff

Shock in his official capacity.  The Court denies as moot Sheriff Shock's motion for summary judgment on Mr. Thompson's claims for compensatory and punitive damages.  To the extent that this Order's resolution of Mr. Thompson's First Amendment claims does not dispose of his claims under the Arkansas Public Employees Political Freedom Act, the Court declines to exercise supplemental jurisdiction over such claims and dismisses without prejudice those claims.

## I.      Factual Background

Mr. Thompson worked at the Faulkner County Sheriff's Office from 1998 to 2005 and again from 2007 to December 31, 2012.  Mr. Thompson was an at-will employee at the Sheriff's Office, serving as a detention officer before moving to the position of transport deputy, which he held until the end of his employment with the Sheriff's Office.

Andy Shock was elected Sheriff of Faulkner County, Arkansas, in November 2012.  He took office January 1, 2013.  Prior to his election, Sheriff Shock worked at the Faulkner County Sheriff's Office for 13 to 14 years.  Sheriff Shock made the decision not to retain Mr. Thompson as an employee in his administration.

On or about November 27, 2012, Mr. Thompson received from then-elect Sheriff Shock a notice of non-selection (Dkt. No. 18-3, at 134).  The notice was effective January 1, 2013.  The notice states that Sheriff Shock selected someone else to occupy the position Mr. Thompson held in the prior administration.  As reasons, the notice states:

> As you are aware, I am the newly elected Sheriff of Faulkner County.  During the course of my campaign, it has been my goal to make sure that the Faulkner County Sheriff's Office is the best it has ever been. To reach this goal, I must be confident that my employees will perform their duties to my satisfaction.  I am not confident that your work performance will meet my expectations.  I have selected someone for your position that I am confident will perform the duties of this position in a manner that will meet or exceed my expectations.

(*Id*.).  The notice further states that, should he wish to do so, Mr. Thompson may request a "pre-deprivation hearing" within three business days of any separation (*Id.*)  Mr. Thompson, and several other individuals, requested such a hearing.  The transcript from that hearing is a part of the record in this case (Dkt. No. 18-3, at 1 – 145).

At the hearing, Sheriff Shock took the position that Mr. Thompson was not terminated or disciplined but instead was "not selected," claiming there was a "big difference."  (Dkt. No. 18-3 at 36).   When asked specifically by Mr. Thompson on cross examination why he was not selected, Sheriff Shock testified under oath as follows:

> The lack of good work ethic.  Not necessarily poor job performance, but when I was campaigning for Faulkner County Sheriff, I spoke to numerous citizens about the present state of the Sheriff's Office and I gave them my word that I would make the decisions that I thought would be best for the citizens of this county, not for Gary Thompson, not for John Randall, not for anyone.  I based that decision on having been in people's homes, having people who had really went out and supported me, I felt obligated that they – to make a right – what I felt would be the right decisions along with my administrative staff.  And when people put you in office, they trust your judgment, and that's exactly what I did.

(Dkt. No. 18-3, at 39).

Despite testifying in response to Mr. Thompson's question that it was "not necessarily" poor job performance, when questioned by his own lawyer on direct examination, Sheriff Shock claimed work performance factored into his decision.  He also claimed that he spoke with staff in the Faulkner County Sheriff's Department before taking office, including meeting with Major Randall.   Although Sheriff Shock claimed that other individuals and supervisors gave him information about Mr. Thompson's work ethic and performance, Sheriff Shock never named these individuals and never identified the specific information he was provided.  Despite this, Sheriff Shock testified that transport deputy, or Mr. Thompson's position, was one area that Sheriff Shock felt he could improve (Dkt. No. 18-3, at 40 - 42).

At the hearing, a specific disciplinary policy was introduced into evidence by the parties (Dkt. No. 18-3, at 115).  There is no indication in the record before the Court that Mr. Thompson was disciplined in accord with the policy during his employment.

Mr. Thompson now alleges in this lawsuit that he was terminated for campaigning in support of Sheriff Shock's opponents in the 2012 election, Tim Ryals and Tommy Earnhardt. The parties agree that Mr. Thompson never displayed any of Mr. Ryals's paraphernalia (Dkt. No. 23-7, ¶ 6).  Mr. Thompson did not know if Sheriff Shock knew that he supported Mr. Ryals, but everyone at his church knew (*Id.*).  Mr. Thompson believed that Sheriff Shock was aware of Mr. Thompson's support of Mr. Earnhardt.  When on duty, officers were prohibited from campaigning, putting bumper stickers on their transport vehicles, or wearing t-shirts supporting candidates.  Mr. Thompson did not do any of that, but there is evidence in the record that Mr. Thompson was active in Mr. Earnhardt's campaign (Dkt. No. 23-1, at 20 – 21).  Mr. Thompson attended campaign events with Tommy Earnhardt and displayed his paraphernalia (Dkt. No. 23-7, ¶ 7).

Mr. Thompson contends, and Sheriff Shock denies, that Sheriff Shock approached Dalton Elliot in April or May of 2012 (Dkt. No. 23-7, ¶ 15).  In the record is an affidavit from Mr. Elliott regarding this purported conversation (Dkt. No. 23-2). Mr. Elliot asserts he was approached by then-Major Shock while they were both working on duty (*Id.*).  Sheriff Shock approached Mr. Elliot and asked him why Mr. Thompson did not like him and also why Mr. Thompson was not supporting him.  Mr. Elliot reports that Sheriff Shock was openly hostile and upset about Mr. Thompson's opposition (*Id.*).  Mr. Elliot contends that he told Sheriff Shock that he would need to talk to Mr. Thompson directly.  Mr. Elliot then told Mr. Thompson about the conversation, and Mr. Thompson approached Sheriff Shock to talk about it (*Id.*).

Mr. Thompson had a conversation with Sheriff Shock in March or April 2012, before the primary, during which Mr. Thompson explained that he had known the other candidates longer than Sheriff Shock (Dkt. No. 23-7, ¶ 9). During that conversation, Mr. Thompson also explained why his wife did not like Sheriff Shock. Mr. Thompson contends that, during this conversation, Sheriff Shock's demeanor changed from casual to defensive (*Id*). Mr. Thompson contends that Sheriff Shock accused Mr. Thompson's wife of running him down. Mr. Thompson had the conversation with Sheriff Shock in an effort to put these matters behind them. Mr. Thompson did not accuse Sheriff Shock of anything. Sheriff Shock did not express his displeasure in any other way. Mr. Thompson does not believe he was retaliated against for the conversation; he believes Sheriff Shock retaliated against him because he supported Sheriff Shock's opponent (Dkt. No. 23-7, ¶ 9).

Other people at the jail gave Mr. Thompson the cold shoulder when they found out he was supporting someone other than Sheriff Shock. Mr. Thompson does not recall the names of any officers who gave him the cold shoulder other than "Vincent" (Dkt. No. 23-7, ¶ 11). Mr. Thompson stated that his termination was related to whom he was supporting in the campaign and not related to his work performance.

Mr. Thompson has submitted in support of his response to Sheriff Shock's motion for summary judgment a signed letter and declaration from Rocky Lawrence (Dkt. Nos. 23-4, 23-5). Mr. Lawrence recounts a conversation he claims to have had with Sheriff Shock before the election in which Sheriff Shock said that he was aware of the officers who were not supporting him and that, if he won the election, there would be a number of officers who would be terminated because they did not support him (*Id.*). Mr. Lawrence explained that he felt this conversation was a subtle threat and warning to those who did not support Sheriff Shock that

their employment with the Faulkner County Sheriff's Office would be in jeopardy, should Sheriff Shock win the election (Dkt. No. 23-4).

Sheriff Shock contends that, along with the other reasons offered in his testimony at the hearing, he did not retain Mr. Thompson in his position because, in his opinion, Mr. Thompson was a "cancer" in the office, was prone to backbiting, and was highly pessimistic, among other things (Dkt. Nos. 18, ¶¶ 17-19; 18-2, at 24). Mr. Thompson denies this (Dkt. No. 23-7, ¶ 18). Mr. Thompson contends that Sheriff Shock has "openly admitted to a flagrant violation of the First Amendment. He has testified that the fact an individual filed a lawsuit would be a factor in his decision not to rehire" (*Id.*).

Sheriff Shock states that, as the incoming Sheriff, he believed that he had the capability of selecting the staff members he wanted for his administration. Further, Sheriff Shock contends that he retained and promoted Katie Ray and retained Josh George, both of whom, according to Sheriff Shock, supported his opponent in the 2012 election for Faulkner County Sheriff. Mr. Thompson denies these allegations (Dkt. No. 23-7, ¶¶ 31-32). Sheriff Shock also states that he retained Todd Nice,[1] who supported Sheriff Shock's opponent in the 2012 primary election for Faulkner County Sheriff. Mr. Thompson denies this allegation and claims that Mr. Nice had a fundraiser for Sheriff Shock and openly supported him (Dkt. No. 23-7, ¶ 33).

Along with claims related to his termination, Mr. Thompson also claims that he is entitled to back pay for the time he was "on call" and required to stay at home during the three years preceding the end of his employment. Mr. Thompson admits that he was paid for all hours he was on the clock, even if he was not transporting someone; admits that he was paid for all hours

---

[1] Defense counsel has inconsistently referred to the person who supported Sheriff Shock's 2012 primary opponent but who was retained by Sheriff Shock as both "Todd Nice" and "Todd Mize." The Court believes that these names are intended to refer to the same individual.

he was on call and transporting someone; but claims that he was on call and working even when he was not called out to transport someone (Dkt. No. 23-7, ¶ 35).  Mr. Thompson contends that this on-call work caused him to work in excess of 40 hours per work week, time for which he claims he was not compensated.  Specifically, Mr. Thompson alleges that he was on call for seven days every third week or approximately 17 weeks in a year (Dkt. No. 23-7, ¶¶ 37-38).  Mr. Thompson alleges that, during this time, he would be called multiple times to receive instructions from work and that, when he was on call from Monday to Thursday, he was called out on average three times (Dkt. No. 23-3, ¶ 5).  Mr. Thompson claims that, for some periods, he would receive no less than five calls per night (*Id.*).  Mr. Thompson also states that, when he was on call during weekend hours, there was almost never a time when he was not called out (*Id.*).  Mr. Thompson admits that he was paid for all the times that he was called out and transported someone (Dkt. No. 23-7, ¶ 41).

In explaining the on-call entries on his time sheet, Mr. Thompson stated that he added handwritten entries to the typed timesheet because he took his transport unit home, and it did not make sense to go to the jail to clock in (Dkt. No. 23-7, ¶ 39).  For some on-call periods during the weekend, Mr. Thompson did not work a normal eight hour shift (Dkt. No. 23-1, at 37), but for other on-call periods, Mr. Thompson states that he would clock out of his normal shift and be on call until he returned for the next day's shift (Dkt. No. 23-1, at 34-35).  Mr. Thompson requested compensation if he was called out for a transport while on call; he would be paid for the time spent on the particular call (Dkt. No. 23-7, ¶ 41).  Here, Mr. Thompson claims that "on call" also included other time during which an employee could be called to do anything (Dkt. No. 23-7, ¶ 42).  However, he admits he was not called for fights or other things when he was on call (Dkt. No. 23-1, at 38).  Lieutenant Lasker, Major Brown, and John Randall told Mr.

Thompson that he would be on call once a month (Dkt. No. 23-7, ¶ 43).  They gave him a sheet that explained the on-call transport (*Id.*).

Mr. Thompson states that "at one point Lieutenant Lasker told us we needed to stay at home" (Dkt. No. 23-1, at 39).  Yet Mr. Thompson also states that, when he asked Lieutenant Lasker if he had to stay at home, Lieutenant Lasker responded by saying "[w]ell, you can't leave the county.  From now on, you got to stay in the county" (Dkt. No. 23-1, at 41).  Mr. Thompson states that this conversation with Lieutenant Lasker occurred in response to an incident during which Mr. Thompson was unable to respond to a call because he had gone shopping 30 minutes away from his house in a different county (Dkt. No. 23-3, ¶ 4).  Mr. Thompson maintains that, when he received calls, he would have to be at home or return to his home to change his clothes and get his patrol car before he could respond and travel to the required destination to make the transport (Dkt. No. 23-1, at 33).  Mr. Thompson states that his on-call time interfered with his personal activities since he could not use the patrol car for personal use (Dkt. No. 23-3, ¶ 6).  Except for the incident during which Mr. Thompson did not respond to a call because he had gone to church and then shopping in another county, Mr. Thompson gives no specific facts as to how he spent his on-call time when he was not responding to calls.

## II.    Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather,

the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    Discussion

In his official and individual capacities, Sheriff Shock moves for summary judgment on Mr. Thompson's retaliation claims alleging violations of the First Amendment to the United States Constitution, the Arkansas Constitution, and the Arkansas Public Employees Political Freedom Act.  Sheriff Shock, in his official capacity, moves for summary judgment on Mr. Thompson's claims under the Fair Labor Standards Act.  Lastly, Sheriff Shock moves for summary judgment on Mr. Thompson's claims for damages.

### A.    Claims Under The First Amendment

As a general matter, at-will public employees have no property rights in their jobs, nor are constitutional rights affected by their firing without cause, except in certain circumstances. Here, although Mr. Thompson concedes he was an at-will public employee, he contends he was fired without cause in violation of the First Amendment to the United States Constitution, the

Arkansas Constitution, and the Arkansas Public Employees Political Freedom Act.[2] Specifically, Mr. Thompson alleges that Sheriff Shock did not retain him as an employee for the Faulkner County Sheriff's Office because he supported Sheriff Shock's opponent in the election for Faulkner County Sheriff.  Mr. Thompson brings these claims against Sheriff Shock in his official and individual capacities.  In his individual capacity, Sheriff Shock asserts the defense of qualified immunity.  The Court will address Mr. Thompson's claims against Sheriff Shock in his individual capacity and Sheriff Shock's individual defense of qualified immunity before analyzing the claims against Sheriff Shock in his official capacity.

### 1.      Individual Capacity Claims And Qualified Immunity

Sheriff Shock moves for summary judgment on Mr. Thompson's First Amendment claim by asserting the defense of qualified immunity.  A government official sued in his individual capacity may raise the defense of qualified immunity.  *Clay v. Conlee*, 815 F.2d 1164, 1169 (8th Cir. 1987).  The doctrine of qualified immunity "protects a government official from liability for civil damages insofar as the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Stepnes v. Ritschel*, 663 F.3d 952, 960 (8th Cir. 2011) (internal quotation marks omitted).

When qualified immunity is asserted as a defense, the court should conduct a two-prong inquiry to determine if the defense applies and should examine:  "(1) 'whether the facts that a plaintiff has alleged. . . make out a violation of a constitutional right' and (2) whether the constitutional right violated 'was clearly established at the time of defendant's alleged

---

[2]   Neither Mr. Thompson nor Sheriff Shock addresses the Arkansas Public Employees Political Freedom Act in their briefings.  Furthermore, this Court is aware of no reported cases that interpret this act.  The act makes it unlawful "for any public employer to discipline . . . or to otherwise discriminate against a public employee because the public employee exercised the right to communicate with an elected public official."  Ark. Code Ann. § 21-1-503(c)(1).

misconduct.'"   *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).   "Qualified

immunity is appropriate only if no reasonable factfinder could answer yes to both of these

questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).   "The plaintiff bears

the burden of proving that the law was clearly established.   If it was not clearly established,

regardless of whether [a plaintiff] has articulated a constitutional violation, the [defendant is]

entitled to qualified immunity." *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013) (citation

omitted).

"[C]ourts are 'permitted to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first.'" *Nord v. Walsh County*,

757 F.3d 734, 738-39 (8th Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

First, the Court will consider whether Mr. Thompson's asserted First Amendment right was

clearly established at the time of Sheriff Shock's alleged misconduct.

The Supreme Court has explained that the purpose of qualified immunity is to ensure

government officials are "on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730,

739 (2002).   Objective legal reasonableness is the touch-stone of the determination. *Anderson v.*

*Creighton*, 483 U.S. 635, 639 (1987).   For qualified immunity to attach, the unlawfulness of the

act in question must be reasonably apparent in the light of preexisting law. *Id.* at 640.

As the Eighth Circuit Court of Appeals has explained:

> "Whether the controlling legal principle has been clearly established is not to be
> determined at the most general level of legal abstraction[.]" *Gorman v. Bartch*,
> 152 F.3d 907, 914 (8th Cir. 1998).   Instead, "[t]he contours of the right must be
> sufficiently clear that a reasonable official would understand that what he is doing
> violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).   Thus, the
> "salient question" for the court to ask is whether the state of the law at the time
> gave the officials "fair warning" their conduct was unlawful. *Hope*, 536 U.S. at
> 741.   We answer this question by examining the "specific actions" of the official.
> *Norman v. Schuetzle*, 585 F.3d 1097, 1109 (8th Cir. 2009).

*Sisney v. Reisch*, 674 F.3d 839, 845-46 (8th Cir. 2012). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (internal quotes omitted).

In *Nord*, the Eighth Circuit held that even if a defendant concedes that a First Amendment right has been violated, it is still necessary to determine whether the plaintiff engaged in speech protected by the First Amendment for the purpose of deciding if the plaintiff's asserted First Amendment right was clearly established. 757 F.3d at 739. Courts use the *Pickering-Connick* balancing test to determine if speech involving a matter of public concern is protected by the First Amendment. *Id.*; *see also Maggio v. Sipple*, 211 F.3d 1346, 1351 (11th Cir. 2000) (holding that plaintiff's "speech is constitutionally protected only if it satisfies both elements of the test set forth in *Pickering* . . . and refined in *Connick*").

To determine whether the *Pickering-Connick* test applies, the Court must "turn to the record to make a substantive analysis" of Mr. Thompson's speech and Mr. Shock's rights as a public employer. *Id.* at 740. This analysis demands a two-step inquiry. First, the Court must determine if "the employee's speech can be fairly characterized as constituting speech on a matter of public concern." *Id.* (internal quotation marks omitted). Second, if the speech involves a matter of public concern, the Court balances the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (internal quotation marks omitted)).

As to the first inquiry under the *Pickering-Connick* test, a matter is one of public concern if it is a "matter of political, social, or other concern to the community at large." *Connick*, 461

U.S. at 144.   Here, Mr. Thompson's speech concerns a political election and his support for Sheriff Shock's opponent.   Accordingly, Mr. Thompson's speech included matters of public concern.

Next, the Court must address the *Pickering-Connick* balancing test.   The *Pickering-Connick* balancing test "weighs the employee's right to engage in the particular speech . . . with such considerations as whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Hinshaw v. Smith*, 436 F.3d 997, 1005 (8th Cir. 2006).   Under this test, the Court analyzes four factors:

> (1) [T]he general authority and responsibilities of the employing government entity, (2) the nature and character of the specific employer-employee relationship, (3) the speech involved and (4) evidence tending to establish the speech's impact on the efficient operation of the government entity.

*Nord*, 757 F.3d at 740.

For example, in *Nord*, the Eighth Circuit held that a North Dakota county sheriff was entitled to qualified immunity for the termination of a deputy sheriff who ran against the sheriff in the previous election.   *Id.*   Applying the *Pickering-Connick* test, the court in *Nord* found that, based on North Dakota state law, the sheriff could believe that his deputies were at-will employees and that he had the authority to terminate the deputies.   *Id.* at 741.   Further, the court recognized that the Eighth Circuit gives deference to law enforcement agencies.   *Id.*   After evaluating the deputy sheriff's speech, which included potentially untrue comments about the sheriff's age and health, the court stated:

> [W]e conclude . . . that even if [the deputy's] speech was fully protected by the Constitution, [the sheriff] could have reasonably believed that the speech would be at least potentially damaging to and disruptive of the discipline and harmony of

and among co-workers in the sheriff's office and detrimental to the close working relationships and personal loyalties necessary for an effective and trusted local policing operation, and, the above-mentioned adverse employer-employee circumstance did not need to become manifest in order to be acted upon promptly by Wild . . . .

*Id.* at 743.  Furthermore, the Eighth Circuit emphasized that "if the evidence in the record is sufficient to proceed with the *Pickering/Connick* balancing exercise, this circuit has held that 'the asserted First Amendment right will rarely be considered clearly established.'"  *Nord*, 757 F.3d at 740 (quoting *Hall v. Mo. Highway & Transp. Comm'n*, 235 F.3d 1065, 1068 (8th Cir. 2000)).

In this case, neither party has briefed application of the *Pickering-Connick* test.  Sheriff Shock states that "Plaintiff's support of another candidate in an election alone would constitute a protected activity (provided, but not conceding that the activity did not occur during Thompson's employment hours or in his official capacity)" (Dkt. No. 17, at 5).  Further, Sheriff Shock only argues that his non-selection of Mr. Thompson was for legitimate reasons and that, therefore, no clearly established law "prohibits such a rational employment decision" (Dkt. No. 17, at 11).  Sheriff Shock does not otherwise argue that the law prohibiting First Amendment retaliation was not clearly established at the time he did not select Mr. Thompson or that he relied on such law.  Nonetheless, Sheriff Shock's subjective intent at the time he terminated Mr. Thompson is not relevant to whether Mr. Thompson's asserted right was clearly established.  *See Mathers v. Wright*, 636 F.3d 396, 401 (8th Cir. 2011) ("The subjective intent of the actor is generally irrelevant to the objective reasonableness test at the heart of the qualified immunity analysis.").  Accordingly, in light of *Nord*, this Court must determine if Sheriff Shock could have reasonably believed that Mr. Thompson's speech was not protected by the First Amendment and, thus, if Sheriff Shock is entitled to qualified immunity.

Mr. Thompson concedes that he was an at-will employee.   Furthermore, like the employment relationship in *Nord*, Mr. Thompson, as a transport deputy, was an agent of Sheriff Shock.   *See* Ark. Code Ann. § 14-15-503 ("Every deputy sheriff appointed as provided by law shall possess all the powers of his or her principal and may perform any of the duties required by law to be performed by the sheriff."); *see also Parker v. Adkins*, 266 S.W.2d 799, 800 (Ark. 1954) (noting that a sheriff may appoint one or more deputies, for whose official conduct he shall be responsible); *Usrey v. Yarnell*, 27 S.W.2d 988, 988-89 (Ark. 1930) ("The general rule is that for all civil purposes the acts of a deputy sheriff or constable are those of his principle. Hence a sheriff or constable is liable for the . . . misconduct done or committed by his deputy . . . ."); *Putman v. State*, 5 S.W. 715, 716 (Ark. 1887) (noting "the common-law right of the sheriff to depute his authority to another for a particular service").

As noted above, the Eighth Circuit gives great deference to law enforcement agencies. *Nord*, 757 F.3d at 741; *Buzek v. Cnty. of Saunders*, 972 F.2d 992, 995 (8th Cir. 1992) ("[L]aw enforcement agencies, more than other public employers, have special organizational needs that permit greater restrictions on employee speech."); *Crain v. Bd. of Police Commissioners*, 920 F.2d 1402, 1411 (8th Cir. 1990) ("More so than the typical government employer, the [Missouri Highway] Patrol has a significant government interest in regulating the speech activities of its officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.").   As in *Nord*, this deference, Mr. Thompson's status as an at-will employee, and the agency relationship between Mr. Thompson and Sheriff Shock weigh in favor of finding that Sheriff Shock is entitled to qualified immunity.

Sheriff Shock characterizes "[t]he speech in this case" as "Thompson's political support of the Defendant's opponent" (Dkt. No. 28, at 5). Sheriff Shock provides no evidence of any speech or political activity in which Mr. Thompson engaged other than general support of Sheriff Shock's opponent in an election, nor does Sheriff Shock offer any evidence of Mr. Thompson participating in this speech during employment hours or in his official capacity. Mr. Thompson states that his speech included "campaigning for Tim Ryals and Tommy Earnhardt" (Dkt. No. 23-7, at 2). Mr. Thompson attended campaign events with Mr. Earnhardt and displayed Mr. Earnhardt's campaign paraphernalia (*Id.*). Further, Mr. Thompson apparently explained to Sheriff Shock in a conversation why Mr. Thompson's wife did not like Sheriff Shock (*Id.* at 3). During this conversation, "Sheriff Shock's demeanor changed from casual to defensive." (*Id.*). Mr. Thompson also states that "[o]ther people at the jail gave [him] the cold shoulder when they found out he was supporting someone other than Sheriff Shock" (*Id.*).

As noted, Mr. Thompson's speech involves a political campaign and matters of public concern. Although Mr. Thompson does not believe that his conversation with Sheriff Shock was the reason that he was terminated, the Court's qualified-immunity analysis does not consider Mr. Thompson's beliefs as to why he was terminated; rather, the Court must analyze—from an objective standpoint—what Sheriff Shock reasonably could have believed in light of pre-existing law. *See Nord*, 757 F.3d at 739. Moreover, the *Pickering-Connick* test demands that the Court determine if Mr. Thompson's speech is "of such public and social importance as to override the [sheriff's] substantial interest in maintaining the efficiency and reputation of the workplace, given the nature of the office." *Id.* at 743 (internal quotation marks omitted).

In *Nord*, the Eighth Circuit held that the sheriff could have reasonably believed that the political speech would disrupt the sheriff's office and that such "adverse employer-employee

circumstance did not need to become manifest in order to be acted upon promptly" by the sheriff. *Id.* Here, Mr. Thompson admits that other employees reacted negatively when they found out he was not supporting Sheriff Shock. Thus, there appears to be at least some evidence in this case that Mr. Thompson's speech was in fact "damaging to and disruptive of the discipline and harmony of and among co-workers in the sheriff's office." *Id.* Even if Mr. Thompson's speech was not in fact disruptive, these facts indicate that Sheriff Shock could have reasonably believed the speech to be damaging and disruptive to the harmony of the office. Moreover, Mr. Thompson's own conversation with Sheriff Shock about why Mr. Thompson's wife disliked the Sheriff could reasonably have indicated to Sheriff Shock that Mr. Thompson's speech and political activities would be "detrimental to the close working relationships and personal loyalties necessary for an effective and trusted local policing operation." *Id.* Even if Mr. Thompson's speech was fully protected by the Constitution, Sheriff Shock reasonably could have believed that Mr. Thompson's speech would be damaging and disruptive of the sheriff's office and relationships of co-workers. Considering Mr. Thompson's status as an at-will employee and agent of Sheriff Shock and the broad deference afforded to the internal affairs of law-enforcement offices, Sheriff Shock "could have logically and rationally believed that his decision to terminate [Mr. Thompson] was well within the breathing room accorded him as a public official in making a reasonable, even if mistaken, judgment under the circumstances." *Id.* Therefore, Sheriff Shock is entitled to qualified immunity as a matter of law. The Court grants Sheriff Shock's motion for summary judgment regarding Mr. Thompson's First Amendment claim against Sheriff Shock in his individual capacity.

Because Mr. Thompson's asserted First Amendment right was not clearly established enough to impose liability on Sheriff Shock, the Court need not address directly whether a

constitutional violation occurred in this case.  Likewise, the Court need not address the parties'
arguments regarding whether or not Sheriff Shock terminated Mr. Thompson because of his
speech or for legitimate, nondiscriminatory reasons.

### 2.      Official Capacity Claims

Mr. Thompson's § 1983 claims against Sheriff Shock in his official capacity is treated as
a lawsuit "against the municipality." *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013).  Even
if Mr. Thompson shows that there has been a constitutional violation, a municipality is liable
under § 1983 "only 'if an action or policy itself violated federal law, or if the action or policy
was lawful on its face but led an employee to violate a plaintiff's rights [and] was taken with
deliberate indifference as to its known or obvious consequences.'"  *Id.* (quoting *Pietrafeso v.
Lawrence Cnty.*, 452 F.3d 978, 982 (8th Cir. 2006)) (internal quotation marks omitted).

Furthermore, the Eighth Circuit has stated:

> Where the municipality has not directly inflicted an injury, however, rigorous
> standards of culpability and causation must be applied, and a showing of
> deliberate indifference is required. The absence of clearly established
> constitutional rights—what Justice O'Connor called "clear constitutional
> guideposts"—undermines the assertion that a municipality *deliberately* ignored an
> *obvious* need for additional safeguards to augment its facially constitutional
> policy. This is not an application of qualified immunity for liability flowing from
> an unconstitutional policy. Rather, the lack of clarity in the law precludes a
> finding that the municipality had an unconstitutional policy at all, because its
> policymakers cannot properly be said to have exhibited a policy of *deliberate*
> indifference to constitutional rights that were not clearly established.

*Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 394 (8th Cir. 2007) (internal citations
and quotation marks omitted).

Mr. Thompson has neither alleged nor argued that his termination was the result of an
official policy or that his termination was taken with deliberate indifference as to its known or
obvious consequences. Moreover, the Court's finding that Mr. Thompson's particular First

Amendment rights were not clearly established precludes this Court from finding that the municipality was deliberately indifferent to Mr. Thompson's First Amendment rights. *Id.* Therefore, the Court grants Sheriff Shock's motion for summary judgment regarding Mr. Thompson's First Amendment claims against Sheriff Shock in his official capacity.

**B.      Claims Under The Fair Labor Standards Act And The Arkansas Minimum Wage Act**

Mr. Thompson claims that, under the FLSA and the AMWA, he is entitled to overtime pay for weeks where he was on call because his on-call time caused his work week to exceed 40 hours of work.  Because, on the facts of this case, the AMWA does not appear to impose requirements different from those imposed by the FLSA, the Court will analyze both claims under the FLSA.  *Compare* 29 U.S.C. § 207(a)(1), *with* Ark. Code Ann. § 11-2-211; *see also Phillips v. City of Pine Bluff, AR*, Case No. 5:07-cv-00207-JLH, 2008 WL 2351036, at *5 (E.D. Ark. June 4, 2008) ("The plaintiffs also cite in their complaint Ark. Code Ann. § 11-4-211 as an alternative basis for their claims. It does not appear, however, that the Arkansas statute imposes a requirement different from that imposed by the Fair Labor Standards Act. Therefore, the Court will grant summary judgment on the state-law claims for the reasons [it did so on the FLSA claims].").

Mr. Thompson's FLSA claims involve two issues:  (1) whether his on-call time constitutes "work" under the FLSA; and (2) if so, whether Mr. Thompson has sufficient evidence to show that the amount and extent of the on-call work exceeded 40 hours as a matter of just and reasonable inference.  The Court considers both of these issues below.

**1.      Defining On-Call Time As Work Under The FLSA**

The FLSA and the AMWA require an employer to pay an employee at a rate of one and one-half times the employee's normal pay rate for all time the employee works beyond 40 hours

19

in a work week. 29 U.S.C. § 207(a)(1); Ark. Code Ann. § 11-2-211. "[T]he FLSA applies only when the employee is 'working' for the employer . . . ." *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001). "[A]n employee's time is 'work' for the purposes of the FLSA if it is spent 'predominantly for the benefit of the employer.'" *Id.* (quoting *Armour & Co. v. Wantock*, 323 U.S. 126 (1944)). In deciding if an employee was "working" under the FLSA, courts use a "practical approach based on the realities of each case." *Armour*, 323 U.S. at 133. "Time spent away from an employer's premises may constitute compensable hours of work if conditions imposed by an employer restrict the employee from using the time for personal pursuits." *Cross v. Ark. Forestry Comm'n*, 938 F.2d 912, 916 (8th Cir. 1991). Although the issue of how a plaintiff spends his on-call time is a question of fact, if there is not a genuine issue of material fact as to how the plaintiff spends the on-call time, determining whether the FLSA protects the plaintiff is a question of law proper for summary judgment. *Ingram v. Cnty. of Bucks*, 144 F.3d 265, 267 (3rd Cir. 1998); *see also Reimer*, 258 F.3d 720 (affirming district court's grant of summary judgment over FLSA claims for overtime payment for on-call time).

Courts consider several non-exhaustive factors to determine if an employee's on-call time constitutes "work" under the FLSA, including the degree to which on-call regulations restrict the employee's ability to engage in personal activities; the time within which the employee is required to respond to a call; the frequency with which the employee responds to calls; and the flexibility that the employee has in scheduling on-call shifts. *See Dickhaut v. Madison Cnty., Iowa*, 707 F. Supp. 2d 883, 888 (S.D. Iowa 2009); *see also Berry v. Cnty. of Sonoma*, 30 F.3d 1174 (9th Cir. 1994) (evaluating the existence of on-premises living requirements, excessive geographical restrictions, frequency of calls, time limits for response, flexibility of on-call

scheduling, use of a mobile device for contacting an employee, and an employee's actual use of his on-call time).

**a.      Location And Response-Time Restrictions**

Courts evaluate any location restrictions and the time within which an employee is required to respond to a call by analyzing the relationship between the location and time requirements and the particular location and demands of the employer.  *See Dickhaut*, 707 F. Supp. 2d at 890-91.  For example, when the employer is located in a rural city and traffic is not a concern, a more restrictive response time may be compatible with effective use of time for personal pursuits.  *Id.* (citing *Dinges v. Sacred Heart St. Mary's Hosps., Inc.*, 164 F.3d 1056, 1057 (7th Cir. 1999) (holding a seven-minute response time did not interfere with employee's personal pursuits)).  *See, e.g.*, *Sletten v. First Care Med. Servs.*, No. 98–2446, 2000 WL 1196199, at *11–12 (D.Minn. Mar. 20, 2000) (holding that a requirement that EMTs stay within five minutes of the ambulance garage did not disrupt their ability to engage in personal activities to such a degree that their on-call time was spent predominantly for the benefit of the employer); *Andrews v. Town of Skiatook, Okla.*, 123 F.3d 1327, 1332 (10th Cir.1997) (finding a response time of five to ten minutes did not preclude plaintiff EMT from using on-call time for his personal pursuits where plaintiff lived in a small town and had access to the entire town within five to ten minutes).

Courts in other jurisdictions have concluded that an employee's on-call time was not compensable time under the FLSA even where the employer required the employee to remain at home or on the employer's premises.  *Rutlin v. Prime Succession, Inc.,* 220 F.3d 737, 738–39 (6th Cir.2000) (holding that employee's time at home when he was not answering calls was not compensable when he was on call daily from 5:00 p.m. to 8:00 a.m. and occasionally from 5:00

pm. Friday until 8:00 a.m. Monday and when he was expected to remain at home while on call and required to answer the employer's calls forwarded to his house); *Halferty v. Pulse Drug Co.,* 864 F.2d 1185, 1189 (5th Cir.1989) (finding that an on-call ambulance dispatcher, who was required to stay home from 5:00 p.m. until 8:00 a.m. five nights a week was not entitled to overtime compensation under the FLSA); *Kelly v. Hines–Rinaldi Funeral Home, Inc.,* 847 F.2d 147, 148 (4th Cir.1988) (holding that a funeral home employee was not entitled to overtime compensation despite the employer's requirement that the employee stay in his residence on premises of the funeral home from 12:00 a.m. to 6:30 a.m.).

In this case, the record evidence before the Court does not indicate clearly how Mr. Thompson spent his time when he was on call.  Sheriff Shock only points to one incident in which Mr. Thompson attended church and went shopping outside of the county while he was on call.  Sheriff Shock contends, however, that Mr. Thompson has not produced sufficient evidence at this stage to show how he spent his on call time "engaged to wait."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944).  Mr. Thompson contends that, after the shopping incident, which occurred in November 2012, Lieutenant Lasker told Mr. Thompson to stay at home or in the area when on call.  Furthermore, both parties seem to have admitted conflicting record facts to the Court.  Sheriff Shock states that "lieutenant Lasker never said to stay at home but to be available and have your cell phone with you" (Dkt. No. 18, ¶ 43).  Mr. Thompson admits this fact (Dkt. No. 23-7, ¶43).  Yet Sheriff Shock also states that "[t]hey told Thompson to pick up the inmates that couldn't be held, stay in the county, and stay at home" (Dkt. No. 18, ¶ 44).  Mr. Thompson also states that he "was told to stay by his unit," and that he could not pursue personal activities because he had to stay by his patrol car and because he could not use the patrol car for personal use (Dkt. Nos. 23-7, ¶44; 23-3, ¶ 6 ).

In his deposition, Mr. Thompson was asked if "prior to that late November time period of 2012 [when the shopping incident occurred], [Lieutenant Lasker] . . . said anything like stay at home . . . ?"  Mr. Thompson responded that "[h]e never said stay at home. He just said, you need to be available. . . . And have your cell phone with you" (Dkt. No. 23-1, at 44).  At most, these record facts establish that Mr. Thompson was asked to stay at home as early as November 2012.  Mr. Thompson's employment with the Faulkner County Sheriff's office ended on December 31, 2012.  Therefore, prior to this time in November 2012, Mr. Thompson only had "to be available."  Also prior to this meeting with Lieutenant Lasker Mr. Thompson admits that, while he was on call, he left the county to go shopping and was not available.  Mr. Thompson's admission shows that he did in fact feel free to pursue personal activities while he was on call, at least up until November 2012.

Even if Mr. Thompson could show that he was required to stay at home or in the county prior to November 2012, Mr. Thompson also would have to provide some evidence that his time was spent predominantly for the benefit of his employer.  Mr. Thompson has presented no evidence that the Faulkner County Sheriff's office imposed any other requirements that prevented him from pursuing personal activities.  Rather, Mr. Thompson has stated that, even when he was at home and on call, he spent time sleeping or perhaps watching T.V. (Dkt. No. 23-1, at 61).  Mr. Thompson's inability to show that he could not pursue personal activities while he was on call pushes this factor in favor of Sheriff Shock.

### b.      Frequency Of Calls

Courts evaluating FLSA claims consider the frequency with which on-call employees are called back to work.  *See Reimer*, 258 F.3d at 725 (noting that it was relatively uncommon for the employees to be called in more than once during their on-call schedules, which mitigated

against concluding that on-call time was spent for the benefit of the employer); *Renfro v. City of Emporia, Kansas*, 948 F.2d 1529, 1537-38 (10th Cir. 1991) (holding that the time firefighter employees spent on call was compensable, in part because they were called back to work on average of three to five times per shift and therefore were not able to use the on-call time for their own benefit).

Here, Mr. Thompson states that, while he was on call, he was called out on average three times when he was on call from Monday to Thursday and, for some periods, as many as five times per night.  Mr. Thompson states that, when he was on call during weekend hours, there was almost never a time when he was not called out.  Yet Mr. Thompson has presented no record evidence to the Court supporting the frequency with which he alleges he was called in to work when he was on call.  The mere scintilla of evidence Mr. Thompson offers is insufficient. *See Smith*, 523 F.3d at 848 ("To establish the existence of a genuine issue of material fact, '[a] plaintiff may not merely point to unsupported self-serving allegations.' The plaintiff 'must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor.'"); *Buford*, 747 F.2d at 447 ("[P]arties opposing a summary judgment motion may not rest upon the allegations in their pleadings.").

### c.      Flexibility In Scheduling

When evaluating FLSA claims, courts also may consider the ability of the employee to trade shifts with another employee in determining whether on-call time is spent predominantly for the benefit of the employer.  *Ingram v. Cnty. of Bucks*, 144 F.3d 265, 269 (3rd Cir. 1998) (holding that on-call time was not compensable, in part, because employees could easily trade shifts in order to pursue their own personal activities); *Berry*, 30 F.3d at 1186 (finding that "an ability to easily trade shifts" supports a finding that on-call time was not spent predominantly for

24

the benefit of the employer); *Renfro*, 948 F.2d 1535 (finding that on-call time was compensable, in part, because "trading on-call shifts was difficult if not impossible"). Nothing in the record before the Court indicates that Mr. Thompson had such flexibility in his on-call schedule. Therefore, this factor does not weigh in favor of either party.

Drawing all reasonable inferences from the record evidence in favor of Mr. Thompson, who is the non-moving party, the Court determines that, because Sheriff Shock has demonstrated some evidence showing that Mr. Thompson felt free to pursue personal activities while he was on call and because Mr. Thompson has neither produced evidence showing how he spent his on-call time unable to pursue such activities nor supporting his allegations of the frequency with which he was called, Mr. Thompson has failed to demonstrate a genuine issue of material fact for trial. Therefore, the Court grants Sheriff Shock's motion for summary judgment on Mr. Thompson's claims under the FLSA and the AMWA against Sheriff Shock in official capacity.

### 2.     Evidence Of Amount And Extent Of Work

"An employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'" *Holaway v. Stratsys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)). The FLSA requires employers to keep records of wages and hours of employees subject to the FLSA; nevertheless, if an employer has failed to keep such records, the employee is "not denied recovery under the FLSA simply because [the employee] cannot prove the precise extent of their uncompensated work." *Id.* Instead, a "relaxed standard of proof" applies, and the employee may recover "based on the most accurate basis possible." *Id.* The employee must show "work performed [for] which the employee was not compensated, and sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*

(internal quotation marks omitted).  The employer then has the burden "to produce evidence to dispute the reasonableness of the inference." *Id.* (internal quotation marks omitted).

Although Mr. Thompson is subject only to this relaxed standard, he must still provide some "details which would allow a jury to determine that he worked beyond 40 hours in any specific week of his employment." *Holaway*, 771 F.3d at 1060.  Mr. Thompson has failed to meet even this relaxed evidentiary standard because he has failed to put forward any evidence of the amount and extent of his on-call work that exceeded 40 hours a week for any specific week he was on call.  Mr. Thompson has, instead, provided contradictory and bare assertions of how he spent his on-call time and of his overtime hours worked while he was on call.  Mr. Thompson has failed to put forth any evidence regarding specific weeks where he worked beyond 40 hours because he was on call and engaged to wait.  Mr. Thompson has not even provided the Court an estimation of how many hours he worked beyond 40 hours a week because of his on-call time where he was engaged to wait.

Even taking the evidence in the light most favorable to Mr. Thompson, the evidence is insufficient and provides no details which would allow a jury to determine Mr. Thompson worked beyond 40 hours in any specific week of his employment.  Therefore, Mr. Thompson has failed to come forward with "sufficient evidence to show the amount and extent of [overtime] work" which would allow a fact-finder to find overtime hours "as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687-88.

Accordingly, the Court grants Sheriff Shock's motion for summary judgment on Mr. Thompson's claims under the FLSA and the AMWA against Sheriff Shock in his official capacity.

### IV.     Damages

Sheriff Shock moves for summary judgment on Mr. Thompson's claims for compensatory and punitive damages.   Because the Court grants Sheriff Shock's motion for summary judgment regarding Mr. Thompson's First Amendment, FLSA, and AMWA claims, the Court denies as moot Sheriff Shock's motion for summary judgment regarding damages.

### V.     Conclusion

For the foregoing reasons, the Court grants in part and denies in part Sheriff Shock's motion for summary judgment (Dkt. No. 16).   The Court grants Sheriff Shock's motion for summary judgment on Mr. Thompson's claims under the First Amendment against Sheriff Shock in his official and individual capacities. To the extent that this Order's resolution of Mr. Thompson's First Amendment claims does not dispose of his claims under the Arkansas Public Employees Political Freedom Act, the Court declines to exercise supplemental jurisdiction over such claims and dismisses without prejudice those claims. The Court grants Sheriff Shock's motion for summary judgment as to Mr. Thompson's claims under the FLSA and AMWA against Sheriff Shock in his official capacity.   The Court denies as moot Sheriff Shock's motion for summary judgment on Mr. Thompson's claims for compensatory damages and punitive damages.

SO ORDERED this the 24th day of June, 2015.

_Kristine G. Baker_
_____
Kristine G. Baker
United States District Judge